**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRITZ FERTILIZERS, INC., | 1:06-CV-00287-OWW-DLB |
| Plaintiff, | MEMORANDUM DECISION AND ORDER RE: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION (DOC. 106); AND (2) DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION (DOC. 112) |
| v. | |
| BAYER CORPORATION; BAYER CROPSCIENCE, LP; et al., | |
| Defendants. | |

## I.  INTRODUCTION

Before the court are two motions both jointly filed by Defendants Bayer Corporation and Bayer CropScience LP (collectively, "Bayer").  In the first motion, Bayer moves for summary judgment or, in the alternative, summary adjudication on the seven claims asserted by Plaintiff Britz Fertilizers, Inc. ("Britz") in its Amended Complaint (Doc. 40), one of which is for breach of a "Contract to Indemnify."  In a second, separate motion, Bayer moves for summary adjudication on the issue of whether a particular distribution agreement, i.e., the "Aventis Distribution Agreement," applies to Britz's claim for breach of a Contract to Indemnify.  Britz opposes both motions.  The following background facts are taken from the parties' submissions in connection with the motions and other documents on file in this case.[1]

_____

[1] "A district court does not, of course, make 'findings of fact' in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) ("As this case was decided on summary judgment, there have not yet

1

II.   BACKGROUND

A.   <u>The Parties</u>

Britz is a distributor of agricultural chemical products. (Doc. 38 at 7.)[2]   Britz is a California corporation with its principal place of business in Fresno, California.   Bayer Corporation is an Indiana Corporation with its principal place of business in Pittsburgh, Pennsylvania.   Defendant Bayer CropScience LP is a Delaware limited partnership with its principal place of business in North Carolina.   The partners of Bayer CropScience LP are entities which are citizens of Delaware, Indiana, and Germany, and none of them are incorporated or have a principal place of business in California.   Jurisdiction is undisputably premised on diversity of citizenship.   28 U.S.C. § 1332.

B.   <u>Ahmad Skouti And The Chemical "Ethrel"</u>

In 2002, one of Britz's customers was Ahmad Skouti ("Skouti"), a grape grower in Fresno and Madera County.   Britz considered Skouti one of its "full-service" customers meaning that, in addition to selling chemicals to Skouti, Britz, through its Pest Control Advisor, Buck Hedman, monitored Skouti's vineyards, provided recommendations to Skouti as to which chemicals to apply, and offered advice as to how to apply those chemicals.   Britz distributed a chemical to Skouti known as "Ethrel," a growth regulator that is supposed to hasten a grape's ripening process and

_____

been factual findings by a judge or jury . . . ."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

   [2] Document ("Doc") 38 is the Scheduling Conference Order dated February 7, 2008.

2

increase its sugar content.

C.   <u>Ethrel And Britz's Distribution Agreements</u>

Initially, Britz purchased Ethrel from the agricultural company known as Aventis with whom Britz had a distribution agreement. Aventis (i.e., Aventis CropScience) and Britz entered into a distribution agreement effective January 1, 2000, through October 31, 2000 ("Aventis Distribution Agreement"). Exhibit "A" to the Aventis Distribution Agreement specifically includes the distribution of "ETHREL." Through written amendments, Britz and Aventis twice extended the term of the Aventis Distribution Agreement from November 1, 2000, to October 31, 2001, and then from November 1, 2001, to October 31, 2002. Each amendment contained Exhibit "A" which specifically includes the distribution of "ETHREL." Britz acknowledges that it executed the original of and the amendments to the Aventis Distribution Agreement, and that it included the distribution of Ethrel.

In addition to the Aventis Distribution Agreement, on or about January 1, 2002, Britz entered into a distribution agreement with *Bayer Corporation* for the period of January 1, 2002, through December 31, 2002 ("Bayer Distribution Agreement"). The Bayer Distribution Agreement does not specifically mention "Ethrel." In June 2002, however, after the Bayer Distribution Agreement commenced and before it expired, Bayer acquired Aventis.

D.   <u>Bayer Acquires Aventis</u>

In June 2002, a division of Bayer acquired Aventis, which resulted in the creation of "Bayer CropScience." A press release, dated June 3, 2002, announced Bayer's acquisition of Aventis and the emergence of "Bayer CropScience." In part, the press release

3

states:

> Leverkusen, June 3, 2002 -- The new Bayer CropScience subgroup, formed through the merger of Bayer's Crop Protection Business Group with Aventis CropScience SA, will begin operating on June 4, 2002.  The industry's new number two company is thus being given the green light following a thorough examination by the antitrust authorities.   The European Commission approved the acquisition in April and the United States Federal Trade Commission . . . gave the go-ahead on May 30.  Closing of the EUR 7.25 billion deal on June 3, marks the biggest acquisition in Bayer's history.[3]

According to the President of Britz, David A. Britz, he saw this press release on or about June 3, 2002.

E.    **Ethrel And Damage To Skouti's Vineyards**

In or about July 2002, Britz sold some Ethrel to Skouti. Along with other agricultural chemicals in a "tank mix," Skouti applied the Ethrel to certain vineyards he owned in Fresno and Madera County, and to a vineyard he leased in Fresno County from Walter Johnsen (collectively, the "Vineyards").   After Skouti applied the Ethrel in the tank mix, the Vineyards sustained damage.

Britz claims that, as with nearly all of the Ethrel it purchased in 2002, Britz purchased the Ethrel it sold to Skouti, which Skouti then applied to the Vineyards, from "Bayer" and not from Aventis.[4]  For argument purposes only, "Bayer is willing to concede this point with the caveat that the billing statements [for the Ethrel sold to Britz at this time] stated 'Bayer CropScience' and not 'Bayer Corporation.'" (Doc. 138 at 4.)   In other words,

---

[3] Leverkusen is a city in Germany.

[4] Britz recognizes it purchased a small amount of Ethrel — 35 gallons — from Aventis in 2002 as reflected in an invoice dated April 25, 2002.  According to Britz, however, no Ethrel from this purchase was sold to Skouti.

Bayer is conceding, for argument purposes, that Britz purchased the Ethrel at issue from Bayer, but not that Ethrel was a product of "Bayer Corporation."  Bayer claims that Ethrel was a product of "Bayer CropScience."

**F.  The September 10, 2002, Letter From Bayer To Britz**

In response to an inquiry by Britz, Bayer Vice President and Assistant General Counsel, William G. Ferguson, wrote David Britz a letter dated September 10, 2002.  In the letter, Ferguson advised Britz that he was not aware of many details regarding a potential claim by Skouti, but that Bayer would defend and indemnify for losses caused by its products in a situation where the "distributor [Britz] acted as a purely 'pass through entity.'"  The September 10, 2002, letter, which contains the subject line "Ethrel Claim (Grapes) - Mr. Ahmad Skouti," reads in pertinent part as follows:

> I understand that you are concerned that the subject individual may file a lawsuit against Bayer CropScience and/or Britz Fertilizer with respect to the use of the (former Aventis) product Ethrel on grapes.
>
> Although I do not have many details on this claim, I understand that you request clarification of Bayer's position with respect to the defense of such a lawsuit.
>
> In reply, I would refer to you to your current Distributor Agreement with Aventis CropScience, specifically to the section dealing with 'Indemnification.' As you will note, it would be Bayer's position that it would defend and indemnify any claim related to its product in a situation where the distributor acted as a purely 'pass through' entity. That is, where there were no claims and/or proof of independent negligence or acts on the part of the distributor, e.g., making recommendations off-label, improper storage, handling or transportation, etc. Were such independent acts alleged, the distributor would be expected to defend them, since those would be theories of liability independent of any actions of Bayer, and the distributor would be in the best position to know the facts involved.
>
> With respect to being named in a lawsuit, of course, as

5

you may know given the current state of litigation in the United States, neither Bayer nor anyone else can control who might be named in a particular lawsuit, or which allegations might be made.   This would be purely up to the plaintiff and his attorney, hopefully on some allegedly factual basis rather than a 'shot gun' approach.

(Smith Decl. Ex. D.)   At the time Skouti applied the Ethrel to the Vineyards in or about July 2002, and at the time of Ferguson's September 10, 2002, letter, the Aventis Distribution Agreement had not yet expired – it was set to expire on October 31, 2002.   The "Indemnification" provision in the Aventis Distribution Agreement states, in relevant part, that "Aventis CropScience shall indemnify, defend, and hold DISTRIBUTOR [Britz] harmless from any third party claims, losses, damages and expenses, including reasonable attorneys fees, arising out of or resulting from Aventis CropScience's negligence, breach of warranty or defective product." (Schrimp Decl. Ex. C.)

The Bayer Distribution Agreement, which was in effect at the time of Ferguson's September 10, 2002, letter, also contains an "Indemnity" provision.   This provision states, in relevant part, that "Bayer Corp. will indemnify Distributor against all claims for property damage or personal injury suffered by third persons caused by goods supplied to Distributor *hereunder* whether arising in warranty, negligence or otherwise, except to the extent the claims are based on any one of the following: a) The negligence of Distributor . . . ." (Schrimp Decl. Ex. D) (emphasis added).

G.   Skouti's Action

On or about December 18, 2002, Skouti and lessor Johnsen filed a lawsuit against Britz in the Fresno County Superior Court (Case No. 02-CECG0450-MWS) to recover damages allegedly sustained to the

6

Vineyards as a result of applying the tank mix (the "Skouti action"). Skouti and Johnsen named Britz as the only defendant in the Skouti action and alleged the tank mix caused damage to the Vineyards. The state-court complaint against Britz alleges causes of action for breach of contract, "negligence," products liability, breach of the implied warranty of merchantability, breach of the implied warranty of fitness and declaratory relief. The complaint does not mention "Ethrel."

In January 2003, Britz's insurance carrier, Farmland Insurance, retained Theodore W. (Tad) Hoppe of Fresno, California, to represent Britz in the Skouti action. On March 7, 2003, Hoppe, on behalf of Britz, filed a cross-complaint against Bayer for declaratory relief and indemnification.

On May 14, 2003, James Moore, Esq., of the law firm of Baker & Hostetler in Houston, Texas, outside counsel for Bayer, wrote to Hoppe about defending and indemnifying Britz with respect to the Skouti action. Moore wrote:

> You have provided to Bayer CropScience ('Bayer') a copy of a complaint that does not mention Bayer or any Bayer product. The complaint alleges, among other things, that Britz Fertilizers, Inc. ('Britz') acted as a consultant for the plaintiff and performed negligently in this capacity. The information provided to Bayer indicates that Bayer has no duty to defend or indemnify Britz Fertilizers in this case.
>
> However, because of Bayer's relationship with Britz, Bayer agrees to defend Britz Fertilizers, Inc. at this time. Bayer will not pay past attorneys fees or costs in this case. Bayer will retain Jim Rushford of Rushford & Bonotto in Sacramento, to defend this matter with you. If there is any evidence in this case of negligence or fault on the part of Britz (whether credible or not), Bayer may at its option withdraw from the defense of this case. In the event that Bayer withdraws from the case, Britz agrees to waive any conflict and allow attorneys retained by Bayer in this matter to continue to represent Bayer if Bayer is included as a party.

1

2

> Britz agrees that it will cooperate fully with Bayer in connection with the defense of this case.  Both Bayer and Britz reserve the issue of indemnity until a later date.

3

4

(Schrimp Decl. Ex. II.)  Hoppe, with the approval of Britz, sent Moore a letter dated May 27, 2003, agreeing on behalf of Britz to the terms proposed by Moore in his May 14, 2003, correspondence. (Schrimp Decl. Ex. C of Ex. B.)  Hoppe also stated, "please have Mr. Rushford contact the undersigned [Hoppe] and we will associate him in as counsel of record." (*Id*.)  On May 30, 2003, Rushford e-mailed Hoppe and stated: "Bayer has retained me to assist in the defense of Britz in the above matter [Skouti v. Britz]. . . . I would like to get together with you, in Fresno, at your earliest convenience to discuss this case.  I look forward to working with you [Hoppe] towards a favorable resolution of this matter." (Smith Decl. Ex. L.)

5

6

7

8

9

10

11

12

13

14

15

16

On June 3, 2006, Britz, through counsel, filed a request for dismissal in the Skouti action in which Britz requested dismissal of Britz's indemnity cross-complaint against Bayer.  The state court entered the dismissal on June 11, 2003.  On or about June 18, 2003, Rushford became co-counsel with Hoppe for Britz.  Over a year and four months later, Rushford withdrew as Britz's co-counsel from the Skouti action.

17

18

19

20

21

22

23

On October 25, 2004, Moore sent a letter to Hoppe which discussed, among other things, Rushford's withdrawal:

24

> Bayer CropScience LP will agree to contribute $100,000 to a CCP § 998 offer to compromise of $500,000.

25

26

> As we stated at the beginning of this suit, it is the view of Bayer CropScience that it has no duty to defend or indemnify Britz Fertilizers, Inc., in this case. Bayer CropScience LP has agreed to pay your fees up to

27

28

8

> now as a goodwill gesture to Britz Fertilizers, Inc.,
> because of the business relationship between Bayer and
> Britz. Bayer will continue to pay your fees and expenses
> provided you sign this letter affirming that Britz will
> not assert that Bayer is responsible for any liability of
> Britz in this case under a collateral estoppel doctrine
> or other doctrine or theory related to or based upon this
> gesture. Bayer does not want its goodwill gesture of
> paying for the defense to be held against it by Britz in
> this matter or a subsequent case.
>
> Also, Jim Rushford will withdraw from this case shortly.
> He has not been actively involved in defending this case,
> which has been defended by you. He may still attend some
> proceedings and will defend any Bayer witness who
> testifies at trial or in a deposition.
>
> Please sign this letter indicating the acceptance of
> Britz to the contents of the letter and return it to me
> as soon as possible.

(Schrimp Decl. Ex. EE.) Hoppe signed the letter. (*Id.*) The parties agree that Rushford announced his intention to withdraw as counsel for Britz on October 25, 2004. The Withdrawal of Counsel form was signed by Hoppe and Rushford, and filed on November 22, 2004.

Bayer paid Rushford's fees through his withdrawal and continued to pay Hoppe's attorney's fees and litigation costs through the Skouti trial, which commenced on February 28, 2005. After three weeks of the Skouti trial, Britz admitted liability for its negligence and contested only the amount of damages. Robert Glassman, Britz's CFO who made the admission on the witness stand, substituted in as a trial attorney for Britz in the Skouti action. Glassman made the admission before the testimony of Britz's expert witnesses.

At the trial, on March 28, 2005, Glassman testified, on direct examination, as follows when being questioned by Hoppe:

> Q. You've had a chance to listen to the evidence being
> presented; correct?

A.   Yes.

Q.   And based upon what you've heard, you have revised your position on the denial of this claim.

A.   Yes.

Q.   And how have you revised it, sir?

A.   The two issues of liability and damages, we agree that that tank mix had some impact and caused the damage and we'll take some liability on that.   We don't know whether it was alone or with other things, but we'll accept that liability.
. . .

Q.   How about damages, sir?

A.   No we totally disagree with the damages and have for years.

Q. So you contest the amount of the damages that are being presented.

A.   Yes, that's what our defense is about.

(Trial Transcript 6:6-17; 6:23-7:2.)   After this admission, opposing counsel, James B. Betts, cross-examined Glassman.   In pertinent part, the cross-examination went as follows:

Q.   Did you participate at Britz in the decision to admit liability in this case?

A. Yes.

Q. And you've seen a lot of different photographs.   I'll touch base on those in a minute.   Let me just go through a couple of elements that I have in mind.

As part of your admission of liability, sir, are you agreeing that Britz Fertilizer had a duty of care, a duty to provide services within a reasonable standard of conduct to Ahmad Skouti and to Walter Johnsen?

A. Yes.

Q. And are you admitting that Britz Fertilizer in making the recommendations that were utilized in 2002 acted below the standard of care and breached its duty to plaintiffs?

A. I'm saying that that is a plausible alternative, enough so that we should admit it.

10

> **Q. Are you admitting that Britz breached its duty to the plaintiffs in this case?**
>
> **A. Yes, we made the sale.**
>
> **. . .**
>
> **Q. Do you admit, sir, that the defendant's breach caused the plaintiffs' damage? Whatever that damage may be.**
>
> **A. Yes.**

(*Id.* at 9:22-10:15; 10:24-26.)   After the admission, the jury awarded substantial damages to plaintiffs, totaling $7,596,247.00. On or about April 14, 2005, the court entered judgment against Britz for that amount plus costs.  Britz appealed, but the judgment was affirmed.  *See Skouti v. Britz Fertilizers, Inc*., No. F048298, 2007 WL 1954089 (Cal. Ct. App. July 6, 2007).  Britz exhausted all of its appeal rights and paid the judgment amount.

At his later deposition, Glassman stated that his admission of liability at the Skouti action "was a method of damage control on the damages," and he "thought that [it] would help" in that regard. (Glassman Dep. 78:21-24.)  Glassman further stated that, at the time he made the admission, "he knew what" the Britz defense experts "were going to say" at the Skouti trial, but he did not believe that they were going to be effective. (Glassman Dep. 81:18.)

Britz has demanded that Bayer indemnify Britz for the judgment rendered in the Skouti action, and for the post-judgment attorney's fees and costs incurred by Britz.  Bayer has refused and claims that the admitted negligence of Britz in the Skouti action bars any claim for indemnification.

G.   <u>The Present Lawsuit</u>

On March 14, 2006, Britz filed a federal complaint against

Bayer (Case No. 1:06-cv-0287-OWW-SMS) for indemnity and declaratory relief, and for damages for fraud, negligent misrepresentation and false promise ("*Britz I*").  On June 11, 2007, Britz filed another federal complaint against Bayer for damages (Case No. 07-cv-0846-OWW-SMS) asserting claims for negligence, gross negligence and negligent supervision ("*Britz II*").

In *Britz II*, Britz filed a first amended complaint for damages on June 18, 2007, alleging claims for negligence, gross negligence, and breach of contract.  On July 17, 2007, Bayer filed a Rule 12(b)(6) motion to dismiss the first amended complaint in *Britz II*, attacking all claims and arguing that the action duplicated *Britz I*.  Bayer's motion was granted in part: the negligence and gross negligence claims were dismissed, but the contract claim survived. (See *Britz II*, Doc. 38.)  In addition, *Britz I* and *II* were ordered consolidated for all purposes including trial and Britz was given time to file a consolidated complaint.

In its consolidated complaint, i.e., its Amended Complaint (Doc. 40), Britz asserts seven claims: (1) breach of a "Contract to Defend"; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of a "Contract to Indemnify"; (4) declaratory relief; (5) fraud; (6) negligent misrepresentation; and (7) false promise.

In its first claim for breach of a Contract to Defend, Britz asserts that the May 14, 2003, letter from Moore constitutes an enforceable contract between Britz and Bayer to defend Britz in the Skouti action.  Britz asserts that Bayer breached this agreement. Britz's second claim for breach of the implied covenant of good faith and fair dealing is also based on the May 14, 2003, letter.

12

Britz asserts that Bayer breached the covenant of good faith and fail dealing implied in the Contract to Defend.

In its third claim for breach of a Contract to Indemnify, Britz asserts that it is contractually entitled to indemnification for the full amount of the judgment in the Skouti action, notwithstanding Britz's admission of liability for its own breach of duty. Britz also claims is it contractually entitled to indemnification for the post-judgment interests, attorney's fees and costs incurred by Britz post-verdict in the trial court and on appeal in the Skouti action. Britz asserts that Bayer's failure to indemnify for these matters constitutes a breach of the indemnification provision in the Bayer Distribution Agreement (not the Aventis Distribution Agreement). Britz claims that the deficient performance and failures of Rushford placed Britz in a position where it proceeded to trial "with an inadequate defense" and "had little choice but to admit liability and contest damages."

In its fourth claim for declaratory relief, Britz seeks three declarations: (1) that Bayer was obligated to furnish Britz with an "adequate defense in the Skouti action, not merely to pay the fees of [Britz's] attorneys"; (2) that Bayer is "obligated to indemnify [Britz] for the judgment against [Britz] in the Skouti [a]ction, and for post-judgment interest and costs"; and (3) that Bayer is "obligated to indemnify [Britz] for [Britz's] attorney fees and costs post-verdict and on appeal in the Skouti [a]ction."

Britz fifth claim for fraud asserts that Bayer made false representations to Britz in Ferguson's September 10, 2002, letter. Britz asserts that Bayer falsely represented in that letter that "it would defend and indemnify any claim related to its product in

a situation where the distributor acted as a purely 'pass through' entity."  Britz asserts that, at all relevant times, it was a "pass through" entity as that term is used in Ferguson's letter and yet it was not indemnified.

In its sixth claim for negligent misrepresentation, Britz asserts that Ferguson, on behalf of Bayer, made a negligent misrepresentation in his September 10, 2002, letter.  Ferguson allegedly had "no reasonable ground for believing" the statements in the September 10, 2002, letter to be true.

Britz's seventh claim for false promise is also based upon the September 10, 2002, letter.  Britz asserts that in Ferguson's September 10, 2002, he promised Britz that Bayer would defend and indemnify Britz in the Skouti action.

H.    Bayer's Motions

In Bayer's first motion for summary judgment or, in the alternative, summary adjudication, Bayer substantively attacks all of Britz's claims.  For Britz's Contract to Indemnify claim, Bayer assumes, *arguendo*, that the indemnity provision in the Bayer Distribution Agreement controls, as Britz contends.

If Britz's contractual indemnity claim survives Bayer's first motion, Bayer advances a separate motion for summary adjudication that the Aventis Distribution Agreement, along with its indemnity provision, controls.  If so, Britz's indemnity claim, based on the Bayer Distribution Agreement, fails as a matter of law.

III.    SUMMARY JUDGMENT/ADJUDICATION STANDARD

"The standards and procedures for granting partial summary judgment, also known as summary adjudication, are the same as those for summary judgment." *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d

**14**

1192, 1200 (S.D. Cal. 1998).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

15

issues of fact and defeat summary judgment." *Id.*  Likewise, "[a] non-movant's bald assertions or a mere scintilla of evidence in his [or her] favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

"[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV.   DISCUSSION AND ANALYSIS

## A.   Bayer's First Motion

### 1.   Breach Of A Contract To Indemnify

The alleged Contract to Indemnify is the indemnity provision in the Bayer Distribution Agreement.  This indemnity provision specifies: "Bayer Corp. will indemnify Distributor [Britz] against all claims for property damage or personal injury suffered by third persons caused by goods supplied to Distributor hereunder whether arising in warranty, negligence or otherwise, *except to the extent the claims are based on* . . . [t]*he negligence* of Distributor." (Schrimp Decl. Ex. D) (emphasis added.)  Bayer argues that Britz's admitted negligence at the Skouti trial precludes Britz's claim for indemnity.

Britz, through its officer and attorney, Mr. Glassman, conceded Britz's negligence (breach of duty) in the Skouti action and the jury returned a verdict against Britz.  Glassman admitted

16

liability believing it would help Britz's position on damages. Britz does not suggest that Glassman testified untruthfully when he, while on the witness stand and being questioned by plaintiffs' counsel, admitted *Britz's* duty to the plaintiffs, *Britz's* breach of that duty, and that the breach caused the damages sustained to the Vineyards.  The jury fixed the amount at over $7 million dollars. The Skouti action was "based" on *Britz's* "negligence" within the meaning of the Contract to Indemnify and no reasonable trier of fact could conclude otherwise.  Britz has not attempted to apportion fault, nor has the product been characterized as itself, inherently defective.[5]  Britz's admission of its own negligence in the Skouti action bars the Contract to Indemnify claim.

To avoid the "negligence" language of the indemnity agreement, in response to Bayer's separate statement of undisputed material facts, Britz claims that "Glassman admitted liability, not negligence."  This one-sentence contention (not repeated in Britz's opposition brief) is specious.  "Negligence" was specifically alleged against Britz in the Skouti complaint.  In addition, on the witness stand, Glassman specifically admitted, in response to focused questions, the elements of negligence – duty, breach, and causation, resulting in damage.  Glassman only disputed the amount of damages.  Given that the state-court complaint specifically alleged a negligence cause of action against Britz and Glassman's explicit testimony admitting each element of negligence, Britz cannot seriously contend that Glassman did not admit negligence or that his testimony does not establish Britz's negligence for

_____

[5] Britz does not assert any claim for equitable indemnity or contribution against Bayer.

17

purposes of the indemnity provision.  Glassman's testimony was unqualified, he referred to Britz only, not Bayer, or the product.

Britz argues that "Bayer cannot rely on Britz's admission of liability as excusing compliance with the indemnity provision because Britz relied to its detriment on Bayer's promise that it would defend Britz in the Skouti action."[6]  Quoting the Restatement (Second) of Contracts § 90(1), and citing *Division of Labor Law Enforcement v. Transpacific Transportation Co.*, 69 Cal. App. 3d 268, 275-76 (1977), Britz argues that "promissory estoppel" precludes Bayer from relying on the negligence provision in the indemnity agreement.  According to the Restatement (Second) of Contracts § 90(1): "A promise which the promisor should reasonably expect to induce action on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

"Promissory estoppel . . . is based upon the equitable doctrine that a promisor is bound when he should reasonably expect a substantial change of position (act or forbearance) in reliance on his promise if injustice can be avoided only by the enforcement of the promise." *Transpacific Transp.*, 69 Cal. App. 3d at 275. "Promissory estoppel is a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." *US Ecology, Inc. v. California*, 129 Cal. App. 4th 887, 901-02 (2005). "[P]romissory estoppel is an equitable doctrine to allow

---

[6]   This argument is premised on the unstated assertion that Glassman's admission of liability was an admission of negligence.

18

1  enforcement of a promise that would otherwise be unenforceable."

2  *Id.*

3       Because the doctrine of promissory estoppel is a consideration

4  substitute, it is wholly inapplicable here.   Bayer's promise to

5  defend Britz in the Skouti action is not otherwise "unenforceable"

6  absent the application of promissory estoppel – the parties do not

7  dispute that Bayer's agreement to defend is an enforceable

8  contract.[7]   Britz cannot invoke promissory estoppel to prevent

9  Bayer from invoking and relying on the express negligence language

10 in the indemnity provision, to which Britz agreed in writing.

11 There is no argument or evidence that Bayer promised not to invoke

12 or rely upon the negligence language in the indemnity provision,

13 let alone that Britz relied upon such a promise to its detriment.

14 Nor is there any argument or evidence that Bayer promised Britz

15 that if Britz admitted liability in the Skouti action, that this

16 strategic choice would help reduce Britz's damages or otherwise

17 work to Britz's advantage.

18      Bayer did not recommend this strategy to Britz.   Rather, this

19 was an independent choice by Britz.   Britz did not notify or seek

20 Bayer's consent to Britz's trial strategy.   Aside from promissory

21 estoppel, which is unavailing, Britz has advanced no other legal

22 theory under which Bayer's promise to defend precludes Bayer's

23 reliance on and enforcement of the express negligence language in

24

25 ─────────────

26      [7]  To the extent Britz argues that Bayer also promised to
provide an "adequate" defense in the Skouti action, and, because of
27 this promise, Bayer is estopped from relying on the negligence
language in the indemnity agreement, this argument fails because
28 Bayer made no such promise of adequacy.

19

the indemnity agreement.[8]

   In its effort to avoid summary judgment, Britz also focuses on Ferguson's September 10, 2002, letter that states "it would be Bayer's position that it would defend and indemnify any claim related to its product in a situation where the distributor acted as a purely 'pass through' entity." According to Britz, there is a triable issue as to what constitutes a "pass through" entity and whether it qualified as a "pass through" entity in the Skouti action.   There are several problems with Britz's new indemnity theory.

   First, Britz never pleaded any indemnity claim based on Ferguson's September 10, 2002, letter.   Britz's claim for breach of a Contract to Indemnify is explicitly premised on the Bayer Distribution Agreement.   Having failed to plead an indemnity claim premised on the September 10, 2002, letter, Britz cannot advance this claim for the first time on summary judgment. *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to advance new theories "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal quotation marks omitted); *see also Gonzalez v. City of*

---

   [8]   While Britz has not advanced any theory which precludes Bayer's reliance on the express negligence language in the indemnity agreement or that prevents Glassman's admission from barring the contractual indemnity claim, this does not mean that Britz's admission categorically precludes other contractual claims Britz asserts.

*Federal Way*, 299 F. App'x 708, 710 (9th Cir. 2008) (affirming the district court's refusal to consider a claim not in the complaint and "raised for the first time on summary judgment"). Britz's failure to allege this theory of indemnity liability and its effort to raise this theory for the first time at summary judgment is fatal.

Second, Ferguson's letter specifically defines what he meant by "pass through" entity. He stated "it would be Bayer's position that it would defend and indemnify any claim related to its product in a situation where the distributor acted as a purely 'pass through' entity. That is, where there were no claims and/or proof of independent negligence or acts on the part of the distributor, e.g., making recommendations off-label, improper storage, handling or transportation, etc. Were such independent acts alleged, the distributor would be expected to defend them, since those would be theories of liability independent of any actions of Bayer, and the distributor would be in the best position to know the facts involved." Based on Ferguson's detailed explanation as to what Bayer meant by "pass through" entity, there is no dispute by contrary evidence from Britz as to what constitutes a "pass through" entity as defined in the letter. No evidence has been identified by Britz that would qualify it as a "pass through" entity.

Britz was more than a pass through distributor in the distribution chain. It was an agricultural chemical service consultant and dealer to Skouti. On the witness stand, Britz, through Glassman, admitted *its* own breach of *its* own duty that *it* owed to the plaintiffs, contesting only the amount of damages.

21

Glassman did so strategically, based on his interpretation, it would improve Britz's position on reducing damages.  Britz has not claimed that Glassman testified untruthfully when he admitted duty, breach, and causation resulting in Skouti's damage.  In the Skouti action, Britz was not merely a "pass through" entity as defined by Ferguson's letter.  No reasonable trier of fact could conclude otherwise from the undisputed facts and admission of Britz.  For all these reasons, Britz's reliance on the September 10, 2002, letter is misplaced.

Britz's admission of its liability for negligence, duty, breach, and causation resulting in damage, in the Skouti action bars its claim for indemnity.  Summary judgment is GRANTED in favor of Bayer on Britz's claim for breach of a Contract to Indemnify.

2.   <u>Breach Of A Contract To Defend</u>

The alleged "Contract To Defend" is the May 14, 2003, letter from Moore to Hoppe.  No party disputes that the May 14, 2003, letter constitutes an enforceable agreement to defend Britz in the Skouti action.  Bayer argues that it performed all the terms actually agreed upon by the parties.  Both Bayer and Britz set out the express substantive terms of the agreement:

1) Bayer agrees to defend Britz Fertilizers, Inc. at this time; 2) Bayer will not pay past attorney's fees or costs in this case; 3) Bayer will retain Jim Rushford of Rushford & Bonotto in Sacramento, to defend this matter with you; 4) If there is any evidence in this case of negligence or fault on the part of Britz (whether credible or not), Bayer may at its option withdraw from the defense of this case; 5) In the event that Bayer withdraws from the case, Britz agrees to waive any conflict and allow attorneys retained by Bayer in this manner to continue to represent Bayer if Bayer is included as a party; 6) Britz agrees that it will cooperate fully with Bayer in connection with the defense of this case; and, 7) Both Bayer and Britz reserve the issue of indemnity until a later date.

22

In making the argument that it performed the express terms of the Contract to Defend, Bayer quotes the following passage from the Memorandum Decision on Bayer's Rule 12(b)(6) motion, which dealt, in part, with the Contract to Defend:

> Contract terms one and three, above, simply require Defendants to defend Britz 'at this time' and to provide Rushford to do so. Defendants are sellers of agricultural products. Defendants could only provide a defense to Britz by providing and paying counsel. The payment of Hoppe's fees (term two) and providing Rushford to assist with Britz's defense (term three) explained how Defendants would defend Britz.

(*See* Britz II, Doc. 38 at 29.)   Bayer contends that it complied with the Contract to Defend because it supplied Rushford, paid for his attorney's fees through his consensual withdrawal, and paid Hoppe's attorney's fees and litigation costs through trial.   In addition, at the Skouti trial, Britz admitted its liability which, according to Bayer, constitutes "any evidence . . . of negligence or fault . . . credible or not" and thus justified Bayer's non-payment of any attorney's fees or costs on appeal.   Accordingly, Bayer contends it complied with all the express terms of the Contract to Defend.

In opposition, Britz does not dispute that Bayer did all of these things, i.e., that Bayer supplied Rushford, and that Bayer paid Rushford's and Hoppe's attorneys' fees and the litigation costs through the Skouti trial.   Nor does Britz dispute that it admitted liability in the Skouti action.   Instead, Britz argues that Bayer did not fulfill all of its obligations under the Contract to Defend.

As far as can be discerned, according to Britz, Bayer breached

the express terms of the agreement in two respects: (1) Bayer did not honor its agreement to "defend" Britz in the Skouti case; and (2) Bayer was required and failed to furnish Britz with a replacement counsel upon Rushford's withdrawal.  With respect to the latter theory, according to Britz, Rushford's withdrawal was not premised on evidence of Britz's negligence or fault, and based on the timing of Rushford's withdrawal, the express terms of the Contract to Defend obligated Bayer to provide Britz with replacement counsel.   This obligation, according to Britz, continued up until the point that Bayer withdrew completely, which was not until after the jury verdict.

In addition to these alleged breaches of express terms, Britz contends that the Contract to Defend contains an "implied" term to "adequately" defend Britz in the Skouti action.  Britz's argues that given California case law on implied terms, and California Civil Code §§ 1655 and 1656 governing implied terms, an obligation to "adequately" defend Britz in the Skouti action is properly read into the agreement.[9]

Bayer rejoins that it satisfied its obligation to "defend" Britz, that Britz had no right to replacement counsel, and even if it did, Britz waived this contractual right.  Bayer further argues that no implied term to "adequately" defend Britz can be read into the agreement.

The contract theories raise several issues: (1) did Bayer

[9] Britz also argues the implied covenant of good faith and fair dealing gave rise to an implied obligation to "adequately" defend Britz in the Skouti action.

1   breach its obligation to "defend" Britz; (2) did Britz have a

2   contractual right to replacement counsel and, if so, did it waive

3   this right; and (3) can an implied term to "adequately" defend

4   Britz be read into the agreement.

5       When Glassman admitted liability on the stand in the Skouti

6   action, this constituted "any evidence . . . of negligence or fault

7   . . . credible or not" on the part of Britz.   No reasonable jury

8   could conclude otherwise.   To the extent Britz's Contract to Defend

9   claim is based on Bayer's alleged non-payment of any attorney's

10  fees or costs on appeal, or any alleged failure to supply counsel

11  on appeal, summary adjudication is GRANTED on this claim in favor

12  of Bayer.   This does not end the inquiry.

13              a.   <u>Alleged Breaches Of Express Terms</u>

14                   i.   <u>The Agreement To "Defend"</u>

15      No party disputes that Bayer agreed to "defend" Britz.

16  Rather, the parties dispute whether Bayer performed its obligation

17  to "defend."   Implicit in Britz's breach theory is the premise,

18  which Bayer vigorously disputes, that paying Hoppe's fees and

19  retaining Rushford did not completely satisfy Bayer's obligation to

20  "defend" Britz under the Contract to Defend.   According to Britz,

21  something more was required.   As stated by Britz in its opposition:

22          The fact that a contract to defend exists between the
            parties is not in dispute, but the meaning of the
23          contract is.  Britz contends that 'to defend' means what
            it says.  'To defend' is all-inclusive term — whatever
24          may be necessary for that purpose.

25  At the heart of Britz's contract claim is the notion Bayer did not

26  do enough to defend it in the Skouti action.

27      The threshold question raised by the parties' briefing is

28
                                25

1  whether Bayer's express promise to "defend" can be interpreted, as

2  Britz suggests, to impose some continuing defense obligation on

3  Bayer over and above its obligation to pay Hoppe's fees and to

4  retain Rushford for Britz pretrial?  If so, the second question is

5  what is the nature and extent of the defense obligation? Third,

6  does a material dispute exist as to its breach?  The answer to the

7  first question is "yes," the answer to the second question is found

8  in the plain language of the agreement, and the answer to the third

9  question is "yes."

10      Both parties apply California law to the interpretation of the

11  agreement. "Under California law, the interpretation of a written

12  contract is a matter of law for the court even though questions of

13  fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d

14  1441, 1443 (9th Cir. 1986).  "It is solely a judicial function to

15  interpret a written contract unless the interpretation turns upon

16  the credibility of extrinsic evidence, even when conflicting

17  inferences may be drawn from uncontroverted evidence." *Hess v. Ford*

18  *Motor Co.*, 27 Cal. 4th 516, 527 (2002) (internal quotation marks

19  omitted).

20      "The basic goal of contract interpretation is to give effect

21  to the parties' mutual intent at the time of contracting." *Founding*

22  *Members of the Newport Beach Country Club v. Newport Beach Country*

23  *Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003).  "When a contract is

24  reduced to writing, the parties' intention is determined from the

25  writing alone, if possible." *Id*.  Unless the words in a contract

26  are used in a technical manner or are defined in the contract,

27  *Superior Dispatch, Inc., v. Ins. Corp. of N.Y.*, 176 Cal. App. 4th

28

12, 30 (2009), "[t]he words of a contract are to be understood in their ordinary and popular sense," *Newport Beach Country Club, Inc.*, 109 Cal. App. 4th at 955.   When interpreting a contract, "[t]he whole of a contract is to be taken together" with "each clause helping to interpret the other." Cal. Civ. Code § 1641.   In addition, a court "may not read the contract in a manner that leads to an absurd result." *Kassbaum v. Steppenwold Prods., Inc.*, 236 F.3d 487, 491 (9th Cir. 2000) (applying California law).

"If a contract is capable of two different reasonable interpretations, the contract is ambiguous." *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (1997).   A court, however, "will not strain to create an ambiguity." *Kashmiri v. Regents of the Univ. of Cal.*, 156 Cal. App. 4th 809, 842 (2007) (internal quotation marks omitted).   "The fact that a term is not defined in the [contract] does not make it ambiguous. Nor does [d]isagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning." *Muzzi v. Bel Air Mart*, 171 Cal. App. 4th 456, 462-63 (2009) (alterations in original) (internal quotation marks omitted).   "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Powerline Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 391 (2005) (internal quotation marks omitted).

"Extrinsic evidence is admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible." *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865

27

(1965).  "If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract." *Newport Beach Country Club, Inc*., 109 Cal. App. 4th at 955.  "When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the . . . court independently construes the contract." *Id*.  No party has offered extrinsic evidence to explain what the parties meant when they agreed that Bayer would "defend" Britz, beyond its plain meaning.

Under California contract principles, Bayer's agreement to "defend" must be interpreted in the context of the instrument as a whole and cannot be interpreted in the abstract.  Bayer agreed to "defend" Britz and then explained two means by which it would do so – by paying Hoppe's fees[10] and by retaining Rushford "to defend" the Skouti action with Britz.  In other words, as part of its agreement to "defend" Britz, Bayer agreed that it would pay Britz's attorney, Hoppe's fees, and would supply another attorney, Rushford, who would "defend" the Skouti matter "with you" (Britz).  The only way Bayer could "defend" the Skouti action is by providing legal representation for the defendant.

As to what "defend" means, to determine the common meaning of a word "a court typically looks to dictionaries." *Lockyer v. R.J.*

---

[10]Although the second contract term is phrased in the negative – "Bayer will not pay past attorney's fees or costs in this case" – no party disputes the natural implication arising from this language, i.e., that Bayer agreed to pay Hoppe's future attorney's fees and costs.

1  *Reynolds Tobacco Co.*, 116 Cal. App. 4th 1253, 1263 (2004).  The
2  dictionary definition of the word "defend" includes "to act as
3  attorney for" and "to deny or oppose the right of a plaintiff in
4  regard to (a suit or a wrong charged)." *See Merriam-Webster's*
5  *Online Dictionary*, http://www.merriam-webster.com (last visited
6  Oct. 14, 2009).  Similarly, the Black's Law Dictionary defines the
7  word "defend" as "to deny, contest, or oppose (an allegation or
8  claim) and "[t]o represent (someone) as an attorney." Black's Law
9  Dictionary 450 (8th ed. 2004).

10  Applying the common meaning of the word "defend" to the
11  agreement, Bayer agreed that it would oppose the Skouti action.  As
12  part of that agreement, Bayer promised that it would supply an
13  attorney, Rushford, who would oppose the Skouti action with Britz's
14  attorney.  If Rushford failed to perform legal services to oppose
15  the Skouti action claims or failed to perform as an attorney for
16  Britz to deny, contest or oppose the Skouti litigation, a material
17  issue of fact exists whether Bayer performed or breached its
18  promise to "defend" the Skouti action by providing Britz with an
19  attorney who would assist in defending.  The agreement does not
20  expressly delineate the nature or extent of defense work to be
21  provided, nor the role of the assigned defense lawyer, i.e., lead,
22  second chair, or monitoring counsel.  No authority is provided as
23  to which party is in control of the defense or who makes final
24  decisions on matters of defense.  This lack of specificity does not
25  preclude a reasonable trier of fact from determining whether
26  Rushford and Bayer failed to "defend" the Skouti action with Britz
27  under the common meaning of the word "defend."

28

29

1    Generally, whether a party has performed as required by a
2 contract, or breached it, is a question of fact. *See Stonebrae,*
3 *L.P. v. Toll Bros, Inc.*, No. C08-0221 EMC, 2009 WL 1082067, at *5
4 (N.D. Cal. Apr. 22, 2009) ("Ordinarily, whether a party has
5 performed as required under a contract is a question of fact for a
6 jury, not a judge, to decide."); 23 Richard A. Lord, *Williston on*
7 *Contracts* § 63:15 (4th ed. updated May 2009) ("[G]enerally whether
8 there was a breach of the terms of a contract is a question of
9 fact.") (footnote omitted).  Here, there is a genuine issue as to
10 whether Bayer breached its promise that an attorney, Rushford,
11 would "defend" the Skouti action with Britz.

12    Despite Bayer's promise that it would defend Britz in the
13 Skouti action and that Rushford would defend the Skouti matter with
14 Britz, Plaintiffs evidence suggests that Rushford did not take an
15 active role in defending the Skouti action.  Moore's October 2004
16 correspondence states Rushford: "has not been actively involved in
17 defending this case."  Instead of actively participating in the
18 defense, there is evidence that Rushford was serving another
19 principal — he was monitoring the case for *Bayer*.

20    Britz points out, and Bayer does not dispute, that at the time
21 Bayer agreed to defend Britz in the Skouti litigation and supply
22 Rushford, Bayer had a pre-existing attorney-client relationship
23 with Rushford, which neither Bayer nor Rushford disclosed to Britz.
24 During the Skouti litigation, according to Rushford, he understood
25 he was reporting to Bayer:

26     Q. Was it your understanding that you were supposed to be
       monitoring the Skouti versus Britz case and reporting —
27     for Bayer and reporting to Bayer?

28
                              **30**

1

**A. Yes.**

2

(Rushford Dep. 147:11-15.)  Bayer's outside counsel, Moore, also

3

acknowledged that "[t]he reason he [Rushford] was hired was because

4

at the time if – our thinking was that if Ethrel got involved in

5

the case – it appeared at the time of the complaint Ethrel was not

6

mentioned, but if that changed and Ethrel became involved,

7

Rushford's role was going to be to defend the product of Ethrel."

8

(Moore Dep. 46:1-6.)  During the Skouti litigation, Rushford sent

9

e-mails to Moore (only) updating him on the progress of the case,

10

which included some discussion of the Ethrel product and Ethrel's

11

potential responsibility for the alleged Vineyard damage. (*See*

12

Schrimp Dep. Exs. KK, LL, NN.)[11]  Bayer concedes that "Rushford was

13

monitoring the litigation in case Bayer was named, which at that

14

point he would be able to defend Bayer." (Doc. 143-1 at 21.)

15

        Viewing the evidence in a light most favorable to Britz,

16

Rushford's undisclosed prior relationship with Bayer, his

17

"monitoring" of the Skouti litigation for Bayer, coupled with his

18

19

        [11] Bayer objects to Exhibit KK of Schrimp's declaration, which

20

is one e-mail from Rushford to Moore.  Britz argues that it lacks
authentication.  Schrimp declares, under penalty of perjury, that

21

Exhibit KK of his declaration is a "true and correct copy of an
undated e-mail from James Rushford to James Moore." In Rushford's

22

deposition, when asked questions by Schrimp about this e-mail,
Rushford discussed this e-mail as if he wrote it, and, when

23

questioned about a particular sentence in the e-mail, Rushford
specifically admitted he "wrote" that sentence.  This is sufficient

24

to authenticate Exhibit KK.  Even if the e-mail lacked
authentication, other e-mails between Rushford and Moore, Exhibits

25

LL and NN, to which Bayer does not object, illustrate the same

26

point for which Exhibit KK is cited.  Bayer's objection to Exhibit
KK is overruled.

27

28

undisclosed communications to Bayer, and his potential role as counsel for Bayer if Bayer was brought into the litigation, raise a question whether Rushford was *defending* the Skouti litigation for or with *Britz* or whether he was solely "defending" Bayer's interests.  Whether Bayer used Rushford only as a monitor, not to "defend" the case, must be decided by the jury.

In addition, Britz raises several arguments about Rushford conduct in the Skouti litigation.[12]  For example, Rushford, who had prior experience in agricultural chemical cases, and who was aware of the use of field trials in such cases, did not recommend that Britz conduct field trials of the tank mix at issue in the Skouti litigation.  Bayer does not dispute that from 2002 to the present time, it had at its disposal scientific expertise and resources, including research facilities and scientific staff qualified and capable to conduct field trials of its products.  Nor does Bayer dispute that it then had the capability to conduct, and in the past has conducted, field trials in which it attempted to replicate a

_____

[12] Bayer's argument that it cannot be held accountable for any of Rushford's actions or omissions in the Skouti litigation is unpersuasive.  This is *not* (or no longer is) a negligence case where Britz is trying to pin tort liability on Bayer for the acts of Rushford based on vicarious liability. *Compare Merrit v. Reserve Ins. Co.*, 34 Cal. App. 4th 858, 880-81 (1973).  This is a breach of contract case, and, in Bayer's contract, Bayer promised that it would defend the Skouti action and it would supply an attorney, Rushford, who would defend the Skouti action with Britz.  If Rushford did not "defend" the Skouti action with Britz before negligence was admitted, a jury could find that Bayer failed to perform its promise that Rushford would do so.  If Rushford did not defend, neither did Bayer.  The language of the letter agreement makes Bayer directly accountable for Rushford's purported failure to defend, not the application of vicarious liability principles.

problem with one of its products, as reported by the grower. Rushford did not invoke Bayer's resources and recommend field trials. After the Skouti litigation, Britz retained its own expert, conducted a field trial with the tank mix, and found that it did not cause crop damage.

There is also evidence that Rushford had concerns about the adequacy of Hoppe's representation, yet Rushford did not report those concerns to Britz (only to Bayer). In an e-mail to Moore, and only Moore, Rushford stated:

> We are supposed to have expert depos next week but, scheduling has not been reliable. I do not think this case is being worked up well for the defense. I don't think our farming expert has done the work we suggested and for some reason, Hoppe did not list the Farm Advisor Leavette as an expert. I also think Hoppe is intimidated by Skouti's counsel.

(Schrimp Dec. Ex. LL.) Bayer concedes "that it did not share Rushford's concerns with Britz." (Doc. 143-2 at 25.) Rather than share these concerns with Britz, and take an active role in the Skouti litigation, Rushford withdrew from the Skouti litigation before the trial began.

This circumstantial evidence all bears on the existence of a triable issue of fact as to whether Bayer breached its commitment to defend. Bayer's motion for summary adjudication on the ground that it did not breach any express term of the Contract to Defend is DENIED.

### ii. The Alleged Agreement To Provide Replacement Counsel

Britz argues that a material dispute of fact exists as to whether Bayer was obligated under the express terms of the Contract

to Defend to furnish replacement counsel upon Rushford's withdrawal and whether Bayer breached that obligation.   In support of its position, Britz quotes a passage from the Memorandum Decision on Bayer's Rule 12(b)(6) motion which dealt, in part, with the Contract to Defend:

> The agreement specifically states Bayer will defend Britz 'at this time' and will retain Rushford to do so in the Skouti Lawsuit.   The parties do not dispute that Defendants paid Hoppe's fees and that Rushford represented Britz for approximately seventeen months and then withdrew from representation several months before the Skouti Lawsuit went to trial. The record does not show why Rushford withdrew from [his] representation of Britz. Term four, above, expressly reserves the right to withdraw from the defense of this case in the event of any negligence by Britz.   There is no provision that Bayer was further obligated to provide a defense or counsel to Britz. *Defendants' failure to provide replacement counsel for Britz after Rushford withdrew may or may not have breached terms number one and three in view of the temporal limitation 'at this time,' which introduces material ambiguity into the extent and length of the defense commitment.*

(Britz II, Doc. 38 at 28-29) (emphasis added).   Quoting this passage, Britz argues that the court has already recognized that the Contract To Defend can be interpreted, as Britz reads it, to impose an obligation on Bayer to provide replacement counsel.

Bayer rejoins that no express term of the Contract to Defend obligated Bayer to provide replacement counsel upon Rushford's withdrawal.   Bayer further notes that the agreement to provide Rushford is a personal services contract which cannot be specifically enforced.   In addition, Bayer suggests that the term "at this time" does not create ambiguity.   According to Bayer, "at this time" means that Bayer could stop paying attorney fees and costs when "there is any evidence in this case [the Skouti action]

34

1   of negligence or fault on the part of Britz (whether credible or
2   not)."   In the alternative, Bayer argues that even if it had an
3   obligation, as Britz contends, to provide replacement counsel for
4   Rushford, Britz waived this right.

5         The Contract to Defend is susceptible of the interpretation
6   that Bayer agreed to defend Britz "at this time."   That term is
7   wholly ambiguous as it leaves open the duration of the promise to
8   defend Britz.   When does the time and defense end? Bayer promised
9   "to defend" not just pay attorney fees and costs until "there is
10  any evidence in this case [the Skouti action] of negligence or
11  fault on the part of Britz (whether credible or not)."   Implicit in
12  the obligation "to defend" is an obligation to pay for or to
13  furnish an attorney "to defend."   Bayer could not otherwise defend
14  Britz   except   by   providing   legal   representation.   Given   the
15  ambiguity,   whether   Bayer   was   obligated   to   provide   replacement
16  counsel upon Rushford's withdrawal cannot be resolved on summary
17  judgment.   *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App.
18  4th 129, 147 (2002) ("[T]he phrase appears ambiguous on the record
19  before us and, as such, presents a question to be resolved by the
20  trier of fact.").   Bayer drafted the agreement and created the
21  ambiguity.   The ambiguity is construed against Bayer.   *Cathay Bank*
22  *v. Lee*, 14 Cal. App. 4th 1533, 1541 (1993) (recognizing that "the
23  usual   rule   [is]   that   ambiguities   are   construed   against   the
24  drafter").

25        Bayer did not tell Britz it would no longer "defend" Britz, it
26  only attained Britz's consent to Rushford's withdrawal. Bayer's
27  argument that a personal services contract cannot be specifically

28

enforced is misplaced.  The issue is whether the Contract to Defend obligated Bayer to provide replacement counsel for Rushford or arrange for a defense, not whether Britz could have specifically enforced the defense agreement for Rushford personally.

Whether Britz waiver its claimed right to replacement counsel creates a triable issue of fact.  "Waiver is the intentional relinquishment of a known right after knowledge of the facts." *Waller v. Truck Ins. Exch., Inc.*,  11 Cal. 4th 1, 31 (1995). "[W]aiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *Id*.  Britz did not expressly waive its right to replacement counsel.  At most, Britz agreed to Rushford's withdrawal, but Britz did not expressly agree that Bayer owed no further obligation to provide replacement counsel for Rushford. Whether Britz impliedly waived its right to replacement counsel "is ordinarily a question of fact." *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc*., 144 Cal. App. 4th 1175, 1191 (2006). Implied waiver "may be determined as a matter of law where the underlying facts are undisputed, or the evidence is susceptible of only one reasonable conclusion." *Oakland Raiders*, 144 Cal. App. 4th at 1191 (internal citations omitted).  That standard is not met here.

To the extent Bayer moves for summary judgment as to Britz's claim that Bayer was obligated but failed to provide replacement counsel for Rushford, Bayer's motion is DENIED.

b. <u>Alleged Breach Of An Implied Term of Adequate Defense</u>

Britz argues, and Bayer disputes, that "implied" in the

Contract to Defend is a term that Bayer would provide an "adequate" defense. According to Britz, Bayer breached this implied term. Britz cites case law, including *Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 473 (1995), and California Civil Code §§ 1655-56, to support its implied term argument. Neither source, however, justifies reading an implied obligation to provide an "adequate" defense into the Contract to Defend.

In *Ben-Zvi* the court explained when implied terms may be read into a contract:

> *Under limited circumstances*, the court may find that a contract includes an implied term or covenant. To effectuate the intent of the parties, implied covenants will be found if after examining the contract as a whole it is so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity.
>
> . . .
>
> A term can only be implied . . . upon grounds of obvious necessity.

40 Cal. App. 4th at 473 (internal citation and quotation marks omitted) (emphasis added). Contrary to Britz's argument, an implied term that Bayer would provide an "adequate" defense in the Skouti action is not "so obvious that the parties had no reason to state the covenant."

There is no language in the agreement remotely related to the nature or quality of the performance to be provided by counsel that Bayer furnished. Bayer is a business entity that sells agricultural products, it is not a legal services provider. Bayer is not in a position to readily assess the quality or sufficiency of Rushford's defense (or Hoppe's defense) to ensure that it is "adequate." It

is not obvious that Bayer would guarantee the adequacy of a service
it is not in the business of providing and not in a position to
assess.  In addition, the term "adequate" is inherently imprecise
and does not provide a discrete benchmark of performance.   A
recognized standard could have been defined by the applicable
standard of care for trial attorneys in agricultural chemical
(products liability) and agricultural chemical service provider
cases.   It is not obvious that the parties would agree to such a
vague performance standard as "adequate."  Finally, Rushford, as an
attorney, already owed a duty, under the professional standard of
care, to provide reasonably competent representation to Britz.  *See
Janik v. Rudy, Exelrod & Zieff, LLP,* 119 Cal. App. 4th 930, 937
(2005); *Ventura County Humane Soc'y v. Holloway*, 40 Cal. App. 3d
897, 902 (1974).

Britz's reliance on the California Civil Code fares no better.
California Civil Code § 1655 states that "[s]tipulations which are
necessary to make a contract reasonable, or conformable to usage,
are implied, in respect to matters concerning which the contract
manifests no contrary intention."   California Civil Code § 1656
states that "[a]ll things that in law or usage are considered as
incidental to a contract, or as necessary to carry it into effect,
are implied therefrom, unless some of them are expressly mentioned
therein, when all other things of the same class are deemed to be
excluded."

A stipulation that Bayer would supply an "adequate" defense is
not necessary to make the contract reasonable.  On the contrary,
given that Bayer is not in the law business, is not in a position

1  to readily assess the "adequacy" of the Skouti defense, and the
2  indeterminate scope of the word "adequate" which has no clear,
3  unambiguous, or regularly accepted meaning, it is not reasonable to
4  read such a term into the agreement.  Reading an "adequate" defense
5  term into the agreement is not necessary to make it reasonable.  Nor
6  is an "adequate" defense term necessary to carry it into effect.
7  The common meaning of the word "defend," coupled with the implied
8  covenant of good faith and fair dealing, is all that is needed to
9  carry the agreement to defend into effect.  No additional
10 contractual requirement of "adequate" representation is necessary.
11 Neither Civil Code § 1655 or 1656 mandates that an implied
12 obligation to provide an "adequate" defense be read into the
13 Contract to Defend.

14      To the extent Bayer moves for summary judgment on Britz's claim
15 for breach of an alleged obligation to provide an "adequate" defense
16 in the Skouti action, Bayer's motion is GRANTED.

17      **3.   Breach Of The Implied Covenant Of Good Faith And Fair
        Dealing**

18
19      Bayer moves for summary judgment on the implied covenant claim
20 arguing that it performed all the express terms of the Contract to
21 Defend, and, accordingly, could not have violated the implied
22 covenant of good faith and fair dealing.  This argument lacks merit
23 — as stated above, there is a triable issue at to whether Bayer
    honored its express contractual duty to "defend."

24      Bayer also argues that summary judgment is appropriate on this
25 claim because Britz is "improperly attempting to use the implied
26 covenant of good faith and fair dealing to augment the agreement by
27

28
                                   **39**

adding an 'adequate defense' term that was not bargained for by the parties."  In its briefing, Britz *does* use the implied covenant of good faith and fair dealing as support for its position that Bayer was obligated to provide an "adequate defense," and contends that Bayer breached the implied covenant in this regard.

The implied covenant of good faith and fair dealing exists in every contract.  The implied covenant "is aimed at making effective the agreement's promises." *Kransco v. Am. Empire Surplus Lines Ins*. *Co.*, 23 Cal. 4th 390, 400 (2000).  "Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Freeman v. Mills, & Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 91 (1995).  The implied covenant "prevent[s] a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract," *Racine & Laramie, Ltd. v. Dept. of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992).  The implied covenant also imposes a duty on each contracting party "to do everything that the contract presupposes that he will do to accomplish its purpose." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1361 (9th Cir. 1986); *see also McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 806-07 (2008).

The implied covenant, however, "does not extend beyond the terms of the contract at issue."  *Poway Royal Mobilehome Owners Ass'n v. City of Poway*, 149 Cal. App. 4th 1460, 1477 (2007). Instead, "the covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract."

**40**

*Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004).  As the California Supreme Court has recognized:

> The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*.  The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

*Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000) (internal citations and quotation marks omitted).

Contrary to what Britz suggests, the implied covenant of good faith and fair dealing did not require Bayer to provide an "adequate" defense.  Such a requirement imposes a substantive duty on Bayer that extends beyond the express terms of the contract.  The implied covenant of good faith and fair dealing cannot be used to so augment the agreement.  The express terms of the agreement required Bayer to "defend" the Skouti action and supply Rushford to "defend" the Skouti action with Britz.  The common and ordinary meaning of the word "defend" is the specified performance obligation.

Even though the implied covenant of good faith and fair dealing did not require Bayer to provide an "adequate" defense, there remains a triable issue as to whether Bayer breached the covenant of good faith and fair dealing.  Viewing the evidence in a light most favorable to Britz, Bayer supplied an attorney, Rushford, who had a prior attorney-client relationship with Bayer, undisclosed by Rushford or Bayer.  Rushford also reported to Bayer during the Skouti litigation, including on the Ethrel product, not to Britz.

41

Rushford also disclosed to Bayer concerns he had with the adequacy of the Skouti defense, but neither Rushford nor Bayer disclosed this fact to Britz.

Viewing the evidence in a light most favorable to Britz, while Bayer promised that it would defend the Skouti action and provide Rushford to Britz, whether Bayer made Rushford fully available to defend or whether Bayer denied Britz the benefits of its bargain, i.e., Rushford's actual assistance in defending the Skouti action with Britz, is a disputed issue of material fact.

To the extent Bayer moves for summary judgment on the ground that the implied covenant cannot be used to impose a duty on Bayer to provide an "adequate" defense, Bayer's motion is GRANTED. Bayer's motion for summary judgment on the ground that it did not breach the implied covenant in any way is DENIED.

### 4.   Causation As To The Contract To Defend And The Implied Covenant Claims

Because there is a triable issue as to whether Bayer breached the Contract to Defend and the implied covenant of good faith an fair dealing in that contract, it is necessary to consider Bayer's motion for summary judgment on the causation aspect of these claims.

Quoting *Ventura*, 40 Cal. App. 3d at 907, Bayer argues that "it is black-letter law that damages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable." Bayer argues that the "entire notion" that its alleged breaches were the cause of an unfavorable judgment at the Skouti trial "is so speculative that Britz cannot recover damages." Bayer

cites two cases, *Vu v. California Commerce Club, Inc.*, 58 Cal. App. 4th 229 (1997), and *Sidney Marshak v. Emma H. Ballesteros*, 72 Cal. App. 4th 1514 (1999), in support of its argument.  Bayer's arguments are not without force.

Causation resulting in damage is an essential element of a claim for breach of contract as well as a claim for breach of the implied covenant of good faith and fair dealing. *Thompson Pacific Construction, Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 541 (2007); *Vu*, 58 Cal. App. 4th at 234.  "A fundamental rule of law is that whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained." *McDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100, 104 (1989) (internal quotation marks omitted).

The requisite causation, or causal connection, between breach and damage is established when the plaintiff demonstrates that the defendant's breach was a "substantial factor" in causing the damage. *Haley v. Casa Del Rey Homeowners Ass'n*, 153 Cal. App. 4th 863, 871 (2007); *US Ecology*, 129 Cal. App. 4th at 909; *Linden Partners v. Wilshire Linden Assocs.*, 62 Cal. App. 4th 508, 530 (1998); *Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063 (1987).  As explained in *US Ecology*:

> The test for causation in a breach of contract (or [implied covenant]) action is whether the breach was a substantial factor in causing the damages. . . . The term 'substantial factor' has no precise definition, but it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.

43

129 Cal. App. 4th at 909 (internal citations and quotation marks omitted).  For a breach to be a substantial factor in causing the damages, it need not be the "sole" or exclusive cause of the damages. *Bruckman*, 190 Cal. App. 3d at 1063; *see also Banville v. Schmidt*, 37 Cal. App. 3d 92, 107 (1974) ("It is an established principle that proximate cause, to be actionable, need not be the sole factor contributing to the damages sustained, but need only be A proximate cause of injury. . . . Nothing occurs in a vacuum, and the event without multiple causes is inconceivable.") (internal quotation marks omitted).

That Glassman admitted liability believing it would be strategically helpful on the issue of damages, does not preclude Britz from establishing causation between Bayer's breach and the alleged damages.  If Britz can demonstrate, i.e., create a triable issue, that Bayer's breach of the Contract to Defend and/or breach of the implied covenant of good faith and fair dealing was *a* substantial factor in causing the damages that accrued, the necessary causal connection exists.  If a reasonable jury would have found Britz liable for the same damages had Bayer not breached, the breach cannot be considered a substantial factor in causing the damages. *See Mills v. U.S. Bank*, 166 Cal. App. 4th 871, 899 (2008) ("Except in situations involving concurrent independent causes, which no one contends is the case here, 'the actor's [wrongful] conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not [acted wrongfully].'") (quoting *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003) (footnote omitted)).

1    Even where a breach is a substantial factor in bringing about
2 damage, other legal principles may operate to preclude recovery.
3 *See Sentry Ins. A Mutual Co. v. U.S. Reports, Inc.*, 322 F. App'x
4 574 (9th Cir. 2009) (recognizing that a breach may be a substantial
5 factor in bringing about damage but another rule of law may relieve
6 the defendant of liability).    For example, if a breach was a
7 substantial factor in causing the plaintiff's damages, but the
8 damages were of a type not reasonably foreseeable at the time of
9 contracting nor within the contemplation of the parties at that
10 time, the damages are not recoverable. *See Equip. Corp. v. Litton
11 Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994) ("Contract damages are
12 generally limited to those within the contemplation of the parties
13 when the contract was entered into or at least reasonably
14 foreseeable by them at that time; consequential damages beyond the
15 expectations of the parties are not recoverable."); *see also Gibson
16 v. Office of Attorney Gen.*, *State of Cal.*, 561 F.3d 920, 929 (9th
17 Cir. 2009) (applying California law and stating "Plaintiffs'
18 contractual claims must fail because Plaintiffs have failed to
19 allege any foreseeable contract damages"); *Lewis Jorge Constr.
20 Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 969 (Cal.
21 2004) ("Contract damages, unlike damages in tort, do not permit
22 recovery for unanticipated injury.") (internal citation omitted);
23 *Coughlin v. Blair*, 41 Cal. 2d 587, 603 (1953) ("Damages must be
24 reasonable, however, and the promisor is not required to compensate
25 the injured party for injuries that he had no reason to foresee as
26 the probable result of his breach when he made the contract.");
27 *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 409 (1988)
28

**45**

1  ("[C]ontract damages are limited to those foreseeable by the parties
2  at the time of contracting."). One situation in which this may
3  occur is "when an independent event intervenes in the chain of
4  causation, producing harm of a kind and degree so far beyond the
5  risk the [defendant] should have foreseen that the law deems it
6  unfair to hold him responsible." *Soule v. Gen. Motors Corp.*, 8 Cal.
7  4th 548, 573 n.9 (1994); *see also Lugtu v. Cal. Highway Patrol*, 26
8  Cal. 4th 703, 725 (2001).

9       In *Vu*, Mansour Matloubi and Tom Vu, brought an action against
10 a gambling establishment, the California Commerce Club, Inc.
11 ("Club"), after they lost a substantial amount of money in two card
12 games – Asian stud poker and Pan-Nine. 58 Cal. App. 4th at 231. The
13 plaintiffs asserted various contract claims including breach of an
14 implied contract, and breach of the implied covenant of good faith
15 and fair dealing, premised on the theory that an implied contract
16 existed between them and the Club whereby the Club impliedly agreed
17 to provide adequate security, including the investigation of
18 cheating, to insure that games were honestly played. *Id.* at 232.
19 The Club allegedly breached this duty, and this caused the
20 plaintiffs to lose their hands to cheating players. *Id*.

21      On appeal, the court concluded that the causal connection
22 between the alleged breach (the Club's failure to provide adequate
23 security) and the damages (the plaintiffs' gambling losses) was
24 "based on speculation" that the games would have turned out more
25 favorable than they did without the alleged cheating. *Id.* at 235.
26 The causal connection between breach and damages was simply too
27 speculative to support a viable claim:

28
                                        **46**

1

2

3

4

5

6

7

8

9

> **Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. (Civ. Code, §§ 3300, 3301.) No such certainty or probability appertains with respect to plaintiffs' gambling losses, assertedly the result of cheating. Assuming arguendo that an adequate causal connection could be established between the club's alleged breach of security obligations and the cheating that plaintiffs allegedly encountered, no such relationship appears between the cheating and plaintiffs' losses. That is because winning or losing at card games is inherently the product of other factors, namely individual skill and fortune or luck. It simply cannot be said with reasonable certainty that the intervention of cheating such as here alleged was the cause of a losing hand, and certainly not of two weeks' or two years' net losses (as alleged by Matloubi and Vu respectively).**

10

11

12

13

14

15

16

17

*Id.* at 233. Here, Bayer attempts to analogize the Skouti litigation to the card games in *Vu*, arguing that the outcome in the Skouti action was "inherently the product of other factors" including the actions of the attorneys for each party, the court, the witnesses, and "ultimately the most unpredictable variable, the jury." Bayer's attempted analogy between the card games in *Vu* and civil litigation is unpersuasive.

18

19

20

21

22

23

24

25

26

27

Although every trial has some element of risk and unpredictability, a card game of chance and a civil lawsuit are too dissimilar to support application of *Vu's* reasoning. In a card game, the players do not get to see the cards of all their opponents. In a civil lawsuit, however, broad discovery permits the parties to put all their "cards" on the table before trial. Second, in many card games, the "skill" a player possesses — for example, being able to read other players, predict the cards held by others, or calculate the odds of winning — is not known to or possessed by other players. In a lawsuit, motion practice, depositions, written

28

47

discovery, and dispositive motions, provide attorneys and parties a means to observe the technical, forensic, and adversary skills of their opponent and to evaluate the likelihood of success on the merits.    In a game of chance, a player has no control over the limited cards dealt to him or her, injecting an element of fortune or luck into the game.   A litigant has the power to gather as many facts as exist in the discovery process and to test their legal merit in dispositive motions and *in limine* motions before trial. "Winning or losing" a civil lawsuit, like the Skouti action, does not hinge on unobservable skill, chance, and unpredictability that is inherent in gambling.

In a lawsuit, the performance of an attorney can be objectively evaluated in light of prevailing standards of care to determine whether breaches of the duty of competence caused the loss of a case.  California courts have long recognized and applied the "trial within a trial" analysis to establish causation between an attorney's wrongful act or omission and the damage the client suffered. *Mattco Forge, Inc. v. Arthur Young & Co*, 52 Cal. App. 4th 820, 840 (1997); *Viner*, 30 Cal. 4th at 1240 n.4, 1241, 1244; *Blanks v. Shaw*, 171 Cal. App. 4th 336, 357 (2009).   In "trial within a trial" cases, to prevail, the plaintiff must demonstrate that absent or "but for the claimed malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." *Viner*, 30 Cal. 4th at 1244 (emphasis removed).   Such a showing satisfies the "substantial factor" requirement of causation, as "the 'substantial factor' test *subsumes* the 'but for' test." *Id*. at 1239.

As explained in *Mattco Forge*:

1
2
3
4
5

> The trial-within-a-trial method does not recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done. . . . Even though 'should' and 'would' are used interchangeably by the courts, the standard remains an *objective* one. The trier of facts determines what should have been, not what the result *would* have been, or could have been, or might have been, had the matter been before a *particular judge* or jury.

6
7
8
9
10
11
12
13
14
15
16
17
18

52 Cal. App. 4th at 840 (citation and internal quotation marks omitted). The "trial within a trial" method "may be complicated, but it avoids speculative and conjectural claims," *Blanks*, 171 Cal. App. 4th at 357, which is the concern at the heart of Bayer's causation argument. Applying that framework here, to survive summary judgment on the issue of causation, Britz must create a triable issue that, absent Bayer's alleged breach of the Contract to Defend and/or the implied covenant of good faith and fair dealing, it is more likely than not that Britz would have obtained a more favorable result in the Skouti action.[13] This is normally a question of fact for the jury. *See Kurinij v. Hanna & Morton*, 55 Cal. App. 4th 853, 864 (1997).

19
20
21
22
23
24
25

The evidence, when viewed in a light most favorable to Britz and drawing all inferences in its favor, is sufficient to create a triable issue on causation. Despite Glassman's potentially supervening admission to breach the chain of causation, there is evidence that Rushford did not take an active role in defending the Skouti litigation and Britz points to specific examples. Among others, Rushford did not disclose the concerns he had regarding the

26
27
28

[13] As Bayer puts it, Britz must prove that, "absent Bayer's alleged breach," Britz "would have obtained a more favorable verdict."

defense, naturally preventing Britz from correcting the perceived deficiencies. He failed to recommend a test trial of the tank mix in the Skouti litigation. Britz has subsequently conducted a test trial of the tank mix at issue the Skouti litigation and allegedly found that the tank mix did not cause crop damage. It is unclear as to the extent Rushford interacted with Hoppe, evaluated Hoppe, or made suggestions how Hoppe's performance before trial could be improved. This presents a triable issue as to whether Rushford's failure to be more actively involved in defense of the Skouti litigation, including his failure to recommend test trials, breached Bayer's promise that Rushford would defend the Skouti litigation and absent this breach, Britz would have more successfully defended the Skouti litigation. Because a reasonable jury could attribute Rushford's failures to Bayer's use of Rushford as a monitor, not a litigator, the implied covenant of good faith and fair dealing claim also survives a causation challenge on summary judgment.

The other case Bayer cites, *Marshak*, 72 Cal. App. 4th 1514, does not alter this analysis. *Marshak* is an example of a "trial within a trial" case that did not survive summary judgment on the issue of causation. There, the plaintiff, Sidney Marshak, hired defendant Emma Ballesteros, an attorney, to represent the plaintiff in a dissolution action. *Id.* at 1516. During the case, the parties attended a mandatory settlement conference at which the plaintiff and his ex-wife stipulated to a settlement in open court. *Id.* The settlement terms covered attorney fees, restraining orders, and distribution of property. *Id.* The settlement also relieved the plaintiff of any continuing support obligation. *Id.* Three days

after entry of the stipulated settlement, the plaintiff, in pro per, filed a motion to set aside the judgment. *Id*. The trial court denied the motion, the plaintiff appealed, and the appellate court affirmed. *Id*. The plaintiff then sued his attorney claiming that she negligently failed to object to the overvaluation of plaintiff's accounts receivable from his medical practice, which was charged to him, and to the undervaluation of the marital residence, which was awarded to plaintiff's ex-wife, which together resulted in a claimed loss to the plaintiff of over three hundred thousand dollars. *Id.* "Thus, the gravamen of plaintiff's complaint is that defendant advised him to settle the marital dissolution action for 'less than the case was worth.'" *Id*.

Consistent with *Viner's* standard, *Marshak* noted that for the plaintiff to prevail in his malpractice action, he "must prove that the dissolution action would have resulted in a better outcome" absent the claimed negligence. *Id*. at 1518. After noting that the breach of a duty causing only speculative harm is insufficient to support a viable claim, the court concluded that the plaintiff lacked evidence demonstrating that, absent the negligence, he would have obtained a better outcome:

> Here, plaintiff simply alleges that the case was worth more than he settled it for. He proffered no evidence to establish the value of his case, other than his own declaration that the family residence was worth more, and the accounts receivable were worth less, than they were valued at for the purposes of settlement. Even if he were able to prove this, however, he would not prevail. *For he must also prove that his ex-wife would have settled for less than she did, or that, following trial, a judge would have entered judgment more favorable than that to which he stipulated. Plaintiff has not even intimated how he would establish one or the other of these results with the certainty required to permit an*

51

1 *award of damages*.

2 *Id.* at 1519.   This case is distinguishable from *Marshak*.

3 　　The plaintiff in *Marshak* proffered no evidence to support the
4 "trial within a trial" analysis.   Britz has evidence to create a
5 triable issue on causation, i.e., whether, absent Bayer's breach of
6 the Contract to Defend and/or the implied covenant of good faith and
7 fair dealing, Britz would have obtained a better outcome in the
8 Skouti action.   "[T]he plaintiff need not prove causation with
9 absolute certainty."  *Viner*, 30 Cal. 4th at 1243.

10 　　Even if Bayer's breach was a substantial factor in causing
11 Britz damage, Britz must establish that the claimed damage, the
12 adverse judgment, was a type of damage reasonably foreseeable or
13 within the contemplation of the parties at the time of contracting.
14 Viewing the evidence in a light most favorable to Britz, one
15 reasonably foreseeable consequence of Bayer's failure to honor its
16 Contract to Defend Britz and/or its breach of the covenant of good
17 faith and fair dealing implied in that contract, was that an adverse
18 judgment would be rendered against Britz for the damage to Skouti's
19 Vineyards.   An adverse judgment in the lawsuit to be defended is the
20 type of harm that a contracting party in Bayer's position would
21 reasonably expect to flow from failing to defend Britz as promised
22 and/or denying Britz the benefits of promised defense.

23 　　Nor can it be concluded as a matter of law that Glassman's
24 admission of liability produced "harm of a kind and degree so far
25 beyond the risk" that Bayer "should have foreseen that the law deems
26 it unfair to hold [Bayer] responsible."  *Soule*, 8 Cal. 4th at 573
27 n.9.   This is question of fact.   The adverse judgment against Britz

28 **52**

1  in the Skouti litigation is the type of harm that Bayer should have

2  foreseen as a likely consequence of its failure to honor its

3  Contract to Defend and/or its breach of the covenant of good faith

4  and fair dealing implied in the Contract to Defend.

5      Bayer's argument regarding the speculative nature of the

6  damages is cogent but unpersuasive.  That damages are hard to

7  measure does not make them unrecoverable.  Bayer's motion for

8  summary judgment on the causation and damages issues is DENIED.

9      **5.   <u>Declaratory Relief</u>**

10     Britz's declaratory relief claim requests a declaration that:

11  (1) Bayer was obligated to furnish Britz with an "adequate defense

12  in the Skouti action, not merely to pay the fees of Plaintiff's

13  attorneys" (2) Bayer is "obligated to indemnify [Britz] for the

14  judgment against [Britz] in the Skouti [a]ction, and for

15  post-judgment interest and costs"; and (3) that Bayer is "obligated

16  to indemnify [Britz] for [Britz's] attorney fees and costs

17  post-verdict and on appeal in the Skouti [a]ction."

18     Summary judgment is warranted on Britz's declaratory relief

19  claim for at least two reasons.  First, Britz's declaratory relief

20  claim fails on the merits with respect to each subject.  Bayer was

21  not obligated, whether by virtue of an implied term or the implied

22  covenant of good faith and fair dealing, to supply an "adequate"

23  defense.  Nor is Bayer obligated to indemnify Britz for the judgment

24  in the Skouti action, for the post-judgment interest and costs, for

25  Britz's attorney's fees and costs post-verdict or on appeal in the

26  Skouti action.  Britz's admission of its own negligence establishes

27  that the Skouti action was "based on . . . [t]he negligence of

28

[the] Distributor" within the meaning of the indemnity agreement. Because Britz's underlying claim for indemnity is barred, its associated claim for a declaration regarding its alleged indemnification entitlements is equally barred. Britz has not sued Bayer for equitable indemnity or contribution. Britz is not entitled to the declaratory relief it seeks.

Second, the declaratory relief Britz requests is inappropriate. A declaratory relief claim "operates prospectively, and not merely for the redress of past wrongs." *Babb v. Superior Court*, 3 Cal. 3d 841, 848 (1971) (internal quotation marks omitted). The purpose of declaratory relief "is to enable the parties to shape their conduct so as to avoid a breach." *Id.* Here, however, Britz seeks declaratory relief only to address "past wrongs" in connection with the Skouti litigation, which is concluded and final. The requested declarations all deal with purported breaches by Bayer which occurred in the past. Britz's declaratory relief is thus not prospective, would not enable the parties to shape their conduct so as to avoid a breach, and is not appropriate.

In a similar vein, courts have recognized where "a party has a fully matured cause of action for money, the party must seek the remedy of damages, and not pursue a declaratory relief claim." *Canova v. Trs. of Imperial Irrigation Dist. Employee Pension Plan*, 150 Cal. App. 4th 1487, 1497 (2007); *see also Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1404 (2002). Here, Britz has fully matured causes of action that seek monetary relief for Bayer's alleged breaches. An associated declaratory relief claim on these fully matured causes of action is inappropriate. Courts have also

recognized that a where a plaintiff has alleged a substantive cause of action, a declaratory relief claim should not be used as a superfluous "second cause of action for the determination of identical issues" subsumed within the first. *Hood v. Superior Court*, 33 Cal. App. 4th 319, 324 (1995) (internal quotation marks omitted). The requested declarations address issues subsumed within Britz's causes of action for breach of the Contract to Defend, breach of the implied covenant of good faith and fair dealing, and breach of the Contract to Indemnify. Accordingly, a separate declaratory relief claim is superfluous and inappropriate.

Britz's declaratory relief claim fails. Summary judgment is GRANTED in favor of Bayer on Britz's claim for declaratory relief.

6.   **Fraud**[14]

In California, "[t]he elements of fraud, which give[] rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003); *see also Conroy v. Regents of the Univ. of Cal.*, 45 Cal. 4th 1244, 1255 (2009); *City Solutions, Inc. v. Clear Channel Commc'n*, 365 F.3d 835, 840 (9th Cir. 2004).

A fraud claim requires actual reliance on the

[14] In its opposition brief, Britz lumps all of its fraud theories together under one heading without addressing the naunces of each fraud claim – fraud, negligent misrepresentation, and false promise – it has alleged.

55

misrepresentation.  Actual reliance "is a component of 'justifiable reliance.'" *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 807 (2007).  "Actual reliance occurs when a misrepresentation is an immediate cause of [a plaintiff's] conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction." *Conroy*, 54 Cal. 4th at 1257 (internal quotation marks omitted) (alteration in original).

The claim for fraud in Britz's Amended Complaint is based on the September 10, 2002, letter from Bayer (Ferguson) to Britz.  As alleged in the Amended Complaint:

81. On or about September 10, 2002, Ferguson, on behalf of Bayer, represented to Plaintiff that: 'it would be Bayer's position that it would defend and indemnify any claim related to its product in a situation where the distributor acted as a purely 'pass through' entity'.

Ferguson's letter continues: "That is, where there were no claims and/or proof of independent negligence or acts on the part of the distributor, e.g., making recommendations off-label, improper storage, handling or transportation, etc.  Were such independent acts alleged, the distributor would be expected to defend them . . ."

According to Britz, as a distributor for Bayer, it was "a purely 'pass through' entity" and yet Bayer failed to indemnify Britz for the liability incurred in the Skouti action.  Accordingly, Britz maintains that Bayer made a misrepresentation.  In its motion for summary judgment, Bayer argues, among other things, that the September 10, 2002, letter did not contain a misrepresentation.

There is no triable issue whether Britz qualified as a "pass

56

1 through" entity as stated in the letter.  On the witness stand,
2 Britz, through Glassman, admitted Britz breached its *own* duty owed
3 to the Skouti plaintiffs, contesting only the amount of damages.
4 Glassman's judicial admission accepting responsibility for
5 negligence was not qualified.  It was strategically made to enhance
6 Britz's position on damages.  Britz has not said that Glassman
7 testified untruthfully nor was there any reservation that Britz was
8 only a pass through dealer.  Rather, Britz recommended the tank mix
9 and Skouti applied it, without direction from Bayer.  No jury could
10 find that Britz was only a "pass through" entity in the Skouti
11 litigation.  Britz never claimed to be a pass through entity and
12 cannot now change the testimony of its CFO which is binding.  There
13 is no basis for a fraud claim on the theory that Bayer made a
14 misrepresentation when it stated it would defend and indemnify Britz
15 in a situation where Britz acted as a purely "pass through" entity
16 as Britz was not and never made that claim in the Skouti litigation.

17       Britz's "pass through" argument, and its fraud claim, also fail
18 for another reason.  Ferguson's letter explained the scope of
19 Bayer's perceived contractual obligation by stating "it would be
20 Bayer's position that it would defend and indemnify any claim
21 related to its product in a situation where the distributor acted
22 as a purely 'pass through' entity.  *That is, where there were no*
23 *claims and/or* proof of independent negligence or acts on the part
24 of the distributor, e.g., making recommendations off-label, improper
25 storage, handling or transportation, etc.  Were such independent
26 acts *alleged*, the distributor would be expected to defend them . .
27 ." (Emphasis added.)  There was a claim of independently negligent

28

conduct on Britz's part.    There are no facts to support a fraud claim on the theory that Bayer made a misrepresentation in the September 10, 2002, letter, when it represented it would defend and indemnify Britz in a situation when it acted as a purely "pass through" entity.    Britz was a consultant and specialist agricultural chemical dealer, and did more than simply sell the product.

Britz raises a new theory of fraud not alleged in its Amended Complaint.    Britz argues that while Bayer promised to defend Britz, Bayer did not retain Rushford to defend the Skouti action, but to "protect its own interests."    Bayer allegedly concealed this purported fact from Britz.    Having failed to plead such a fraudulent concealment claim, Britz cannot advance such a fraud claim for the first time at summary judgment.    *See Pickern*, 457 F.3d at 968-69; *Wasco Prods., Inc.*, 435 F.3d at 992; *see also Gonzalez v. City of Federal Way*, 299 F. App'x at 710.    Moreover, Britz does not explain how Bayer's non-disclosure (as opposed to Rushford's failure to defend) caused Britz to suffer damages.    In any event, having failed to allege this fraud theory, Britz cannot assert it for the first time on summary judgment.

Summary judgment on Britz's intentional fraud claim is GRANTED in favor of Bayer.

7.   <u>Negligent Misrepresentation Claim</u>

The tort of negligent misrepresentation is "a species of the tort of deceit." *Conroy*, 45 Cal. 4th at 1255.    Unlike fraud, however, a negligent misrepresentation claim "does not require scienter or intent to defraud." *Small*, 30 Cal. 4th at 173.    It still, however, requires a misrepresentation.    A negligent

misrepresentation claim "encompasses [t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true," and [t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." *Small*, 30 Cal. 4th at 174.   Justifiable and actual reliance on the negligent misrepresentation, and resulting damage, are also required. *Alliance Mortgage Co. v. Rothwell,* 10 Cal. 4th 1226, 1239 n.4 (1995)*; Conroy*, 45 Cal. 4th at 1256.

Britz's negligent misrepresentation claim is also premised on the September 10, 2002, letter.[15] For the same reasons discussed above, Britz's negligent misrepresentation claim cannot survive summary judgment.   Contrary to Britz's arguments, there is no triable issue as to whether Britz qualified as a purely "pass through" entity in the Skouti action as stated in the letter – it did not and no reasonable jury could conclude otherwise.   Because there is no triable issue as to whether Britz qualified as a "pass through" entity, there is no basis for a negligent misrepresentation claim on the theory that Bayer made a negligent misrepresentation when it stated it would defend and indemnify Britz in a situation where it acted as a purely "pass through" entity.

Summary   judgment   is   GRANTED   on   Britz's   negligent

---

[15] In its briefing, Britz argues that "there are genuine issues of material fact as to whether at the time he wrote his September 10, 2002, letter, Ferguson intentionally *or negligently misrepresented* to Britz that it would be Bayer's position that it would defend and indemnify Britz in connection with the Skouti claim." (Doc. 130 at 40) (emphasis added.)

1  misrepresentation claim.

2       **8.   <u>False Promise Claim</u>**

3       "'Promissory fraud' is a subspecies of the action for fraud and
4  deceit.  A promise to do something necessarily implies the intention
5  to perform; hence, where a promise is made without such intention,
6  there is an implied misrepresentation of fact that may be actionable
7  fraud." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).   "To
8  maintain an action for deceit based on a false promise, one must
9  specifically allege and prove, among other things, that the promisor
10 did not intend to perform at the time he or she made the promise and
11 that it was intended to deceive or induce the promisee to do or not
12 do a particular thing [i.e., to induce reliance]." *Bldg. Permit*
13 *Consultants, Inc. v. Mazur*, 122 Cal. App. 4th 1400, 1414 (2004).
14 Justifiable and actual reliance on the false promise, and resulting
15 damage, are also required. *Dore v. Arnold Worldwide, Inc.*, 39 Cal.
16 4th 384, 393 (2006); *Lazar*, 12 Cal. 4th at 638-39; *Mazur*, 122 Cal.
17 App. 4th at 1415.

18      Britz's claim for false promise is also based on the September
19 10, 2002, letter.  In the letter, Bayer promised that "it would
20 defend and indemnify any claim related to its product in situation
21 where the distributor acted as a purely 'pass through' entity."  For
22 the same reasons discussed above, Britz's promissory fraud claim
23 cannot survive summary judgment.  Contrary to Britz's arguments,
24 there is no triable issue as to whether Britz qualified as a purely
25 "pass through" entity in the Skouti action as stated in the letter.
26 Britz was not and no reasonable jury could conclude otherwise.
27 Because there is no triable issue as to whether Britz qualified as

28

a pass through entity, there is no basis for a promissory fraud claim on the theory that Bayer made a false promise when it stated it would defend and indemnify Britz in a situation where it acted as a purely "pass through" entity and yet failed to do so, when Britz admitted it was negligent as to the Skouti plaintiffs and could not be a "pass through" entity as a matter of law.

**B.   <u>Bayer's Second Motion</u>**

In Bayer's second motion, Bayer argues that, for purposes of Britz's Contract to Indemnify claim, the Aventis Distribution Agreement is the applicable agreement, and not the Bayer Distribution Agreement as claimed by Britz.   Because summary judgment is warranted on Britz's claim for breach of the indemnity provision in the Bayer Distribution Agreement, it need not be determined whether the Aventis Distribution Agreement, which specifically mentions Ethrel, applies.   Accordingly, Bayer's second motion for summary adjudication is DENIED as moot.

**C.   <u>Ancillary Matters</u>**

**1.   <u>Judicial Notice</u>**

In connection with Bayer's motions, both parties have filed requests for judicial notice.   A court make take judicial notice of a fact that is not "subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."   Fed. R. Evid. 201(b).   Under Federal Rule of Evidence 201, "a court may take judicial notice of matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)

1  (internal quotation marks omitted).

2      With respect to its first motion for summary judgment or, in
3  the alternative, summary adjudication, Bayer requests judicial
4  notice of various exhibits to the declaration of T. Mark Smith,
5  which are all litigation-related documents.  Bayer requests judicial
6  notice of Exhibit P, a previous opposition brief in this action,
7  Exhibit FF, an earlier declaration in this action by Glassman,
8  Exhibit GG, an earlier declaration by Hoppe, Exhibit B, the Skouti
9  complaint, Exhibit U, a filed withdrawal of counsel form in the
10  Skouti action, Exhibit O, an association of counsel form in the
11  Skouti action, Exhibit V, a trial transcript from the Skouti action,
12  Exhibit Z, the judgment in the Skouti action, Exhibit AA, the
13  opinion by the California Court of Appeals in the Skouti action, and
14  Exhibit CC, an acknowledgment of satisfaction of judgment filed in
15  the Skouti action.  These are all public records – some were already
16  on the docket in this action and others are part of the state-court
17  Skouti litigation.  Because they are public records, judicial notice
18  of these documents can be taken.  However, to the extent that the
19  contents of the documents are disputed, existence of the documents
20  is noted. *Lee*, 250 F.3d at 689-90.  This request for judicial notice
21  is GRANTED.

22      In connection with its opposition to Bayer's first motion,
23  Britz requests judicial notice of three documents attached to the
24  declaration of Roger M. Schrimp: (1) Britz's Amended Complaint in
25  this action; (2) the previously-issued Memorandum Decision on
26  Bayer's Rule 12(b)(6) motion to dismiss; and (3) a previous order
27  of Magistrate Judge Beck in this action.  These documents are

28

matters of public record and judicial notice of them can be taken subject to the non binding effect of disputed matters in the documents.   This request for judicial notice is GRANTED.

In connection with Bayer's reply to the first motion, Bayer requests judicial notice of Exhibit A to another declaration of T. Mark Smith.   Exhibit A is the cross-complaint Britz filed against Bayer CropScience in the Skouti action.   As a matter of public record, judicial notice of this document can be taken, disputed contents are not deemed established.   This request for judicial notice is GRANTED.

As to the second motion for summary adjudication, Bayer requests judicial notice of Exhibits M and N attached to a different declaration of T. Mark Smith.   This request for judicial notice appears to duplicate another Bayer request for judicial notice. Exhibits M and N are documents already included in Bayer's first motion for judicial notice (they just have different lettered tabs in this request).   This latter request for judicial notice is DENIED.

As to its opposition to Bayer's second motion, Britz requests judicial notice of its Amended Complaint in this action.   This separate request for judicial notice duplicates Britz's other request for judicial notice already GRANTED.

2.   Evidentiary Objections

In connection with Bayer's motion for summary judgment or, in the alternative, summary adjudication, Bayer has filed written objections to certain items of evidence. (Doc. 140.)   Bayer has objected to certain paragraphs of, and parts of an exhibit attached

1  to, the declaration of Dale Dorfmeier.  Bayer has also objected to
2  certain exhibits attached to the declaration of Roger Schrimp.  The
3  objection to Exhibit KK to Schrimp's declaration is overruled.  With
4  respect to the remainder of the objections, in ruling on Bayer's
5  motion, no reliance was placed on inadmissible evidence properly
6  objected to by Bayer.  Bayer's remaining evidentiary objections are
7  DENIED as moot.

### V.   CONCLUSION

9  For the reasons stated:

10     1.    Summary judgment is GRANTED in favor of Bayer on Britz's
11 claim for breach of the express Contract to Indemnify.

12     2.    Summary judgment is GRANTED in part in favor of Bayer and
13 DENIED in part on Britz's claim for breach of a Contract to Defend.

14         a.    To the extent Bayer moves for summary judgment on the
15 ground that it did not breach the Contract to Defend, and that
16 damages are speculative, Bayer's motion is DENIED.

17         b.    To the extent Bayer moves for summary judgment as to
18 Britz's claim that Bayer was obligated but failed to provide
19 replacement counsel for Rushford, Bayer's motion is DENIED.

20         c.    To the extent Bayer moves for summary judgment on
21 Britz's claim for breach of an alleged obligation to provide an
22 "adequate" defense in the Skouti action, Bayer's motion is GRANTED.

23         d.    To the extent Bayer moves for summary judgment on
24 Britz's claim for breach of an alleged obligation to pay attorney's
25 fees and costs on appeal in the Skouti action, Bayer's motion is
26 GRANTED.

27     3.    Summary judgment is GRANTED in part in favor of Bayer and

28

DENIED in part on Britz's claim for breach of the implied covenant of good faith and fair dealing.

       **a.**   To the extent Bayer moves for summary judgment on the ground that it did not breach the covenant of good faith and fair dealing implied in the Contract to Defend, and that damages are speculative, Bayer's motion is DENIED.

       **b.**   To the extent Bayer moves for summary judgment on the ground that the implied covenant did not obligate Bayer to provide an "adequate" defense in the Skouti action, Bayer's motion is GRANTED.

   **4.**   Summary judgment is GRANTED in favor of Bayer on Britz's declaratory relief claim.

   **5.**   Summary judgment is GRANTED in favor of Bayer on Britz's intentional fraud claim.

   **6.**   Summary judgment is GRANTED in favor of Bayer on Britz's negligent misrepresentation claim.

   **7.**   Summary judgment is GRANTED in favor of Bayer on Britz's false promise claim.

   **8.**   The requests for judicial notice in connection with Bayer's first motion for summary judgment or, in the alternative, summary adjudication, are GRANTED. The requests for judicial notice in connection with Bayer's second motion for summary adjudication are duplicative and DENIED.

   **9.**   Bayer's written evidentiary objections are DENIED without prejudice

   Bayer shall submit a form of order consistent with, and within five (5) days following electronic service of, this Memorandum

1  Decision.

2       Consistent with Rule 56(d)(1), all parties shall have five (5)

3  days following electronic service of this decision to file a list

4  of material facts which each party believes are not genuinely at

5  issue for purposes of trial.  If separately filed by the parties,

6  these lists shall not exceed five pages.  STo the extent

7  practicable, the parties should meet and confer to determine whether

8  and to what extent any material facts are agreed upon for purposes

9  of trial.  Agreed upon facts should be listed in a joint filing.

10 Any such joint filing has no page limitation.

11

12 SO ORDERED
   Dated: October 16, 2009

13                                    ____/s/ Oliver W. Wanger____

14                                       Oliver W. Wanger
                                      United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28